1
2
3
4
5
6                IN THE UNITED STATES DISTRICT COURT
7
8             FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10 RAOUL FLAVIANO,
11           Plaintiff,                 No. C 14-05671 WHA
12   v.
13 CALIFORNIA DEPARTMENT OF        **AMENDED ORDER**
STATE HOSPITALS, NAPA, DENISE    **GRANTING DEFENDANTS'**
14 DALY, JASON GOODING, and DOES 1    **SECOND MOTION FOR**
through 50, inclusive,              **SUMMARY JUDGMENT**
15
16          Defendants.
  ————————————————————/
17

18                    **INTRODUCTION**

19      In this employment-discrimination action, defendants move for summary judgment,

20 after an earlier summary judgment motion addressing the scope of a release in a settlement

21 agreement dismissed several claims.  For the reasons stated below, defendants' motion is

22 **Granted**.

23                    **STATEMENT**

24      Plaintiff Raoul Flaviano is a native Filipino man who worked for defendant Department

25 of State Hospitals, Napa ("DSH"), from November 2001 to June 2013.  DSH hired him as a

26 sworn police officer at Napa State Hospital after he completed a search and seizure class.  He

27 did not attend a police academy prior to starting work at DSH.  At all relevant times, Flaviano

28 was married to Raquel Maisonet, with whom he had a daughter, but they are now divorced

(Flaviano Dep. at 11–12, 14, 16, 18).

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

Flaviano received a promotion to the position of acting sergeant, which position he held for two or three years and then received a second promotion to full-time sergeant, which position he held for two or three years prior to the start of our dispute (Flaviano Dep. at 24–25). (The precise dates are not specified in our record, except that Flaviano became a full-time sergeant by October 2007.)

The position of Hospital Police Sergeant primarily required supervision of the hospital police officers assigned to a particular shift.  DSH generally scheduled its police officers to work on one of three eight-hour watches, which provided continuous coverage twenty-four hours a day.  First watch ran from 10:00 p.m. to 6:00 a.m., second watch ran from 6:00 a.m. to 2:00 p.m., and third watch ran from 2:00 p.m. to 10:00 p.m.  As each shift ended and the next began, the sergeants assigned to the consecutive shifts held a "turnover" meeting at which the outgoing sergeant would brief the incoming sergeant about any noteworthy occurrences on the previous shift.

The responsibilities of Hospital Police Sergeants also included managing schedules for the officers, assigning, coordinating, and reviewing work, and recommending commendations and adverse actions.  Secondary responsibilities included compliance with mandates governing the hospital's operations, training officers, ensuring a shift maintained adequate coverage, and maintaining morale.  As a sergeant, Flaviano reported directly to the lieutenant for his shift. Sergeants were "required to work any shift and schedule in a variety of settings throughout the hospital and [might] be required to work overtime and float to other work locations as determined by the operational needs of the hospital" (Gooding Decl., Exh. A).

At some point, unclear from the record, Flaviano came to be assigned to the second watch (6:00 a.m. to 2:00 p.m.), on which shift his wife also worked as an officer at Napa State Hospital.  Lieutenant Florentino Malasan supervised Flaviano in that assignment.  At some point thereafter, Flaviano began working on an alternate work schedule, "0700 to 1500 hours on Tuesday, Wednesday and Thursday" and "regular shift" on other work days, which gave him time to drop his daughter off at day care at 6:15 a.m., the earliest he could arrange (Flaviano Dep. at 24, 26, 44–45).

2

United States District Court
For the Northern District of California

After approximately two years on the alternate work schedule, Flaviano transferred to another department, where he orally requested the same schedule accommodation from his new supervisor, Lieutenant Todd Kyle. He continued to follow his alternate work schedule (*id.* at 36; Gooding Decl. ¶ 8). At some time not specified in the record but several months prior to June 2012, Lieutenant Jeffrey Coleman became Flaviano's supervisor in place of Lieutenant Kyle and defendant Denise Daly became chief of the department (Flaviano Dep. at 38–39). Lieutenant Coleman initially allowed Flaviano to continue his alternate work schedule but informed Flaviano that he (Lieutenant Coleman) would need to seek approval from Chief Daly to continue Flaviano's alternate work schedule, because Chief Daly "had problems" with Flaviano's alternate work schedule (Flaviano Dep. at 38–39; Flaviano Decl. ¶ 8).[1]

So began the instant dispute.

Flaviano discussed his request for an alternate work schedule in a meeting with both Chief Daly and Lieutenant Coleman in June 2012. (It is unclear, but immaterial, whether Lieutenant Coleman ever sought approval on Flaviano's behalf prior to the meeting.) At that meeting, Chief Daly told Flaviano, "You're lucky you've gotten away with it this long," referring to the alternate work schedule. She also informed him that the department could not continue to allow Flaviano to maintain an alternate work schedule because he needed to attend the turnover meetings with the outgoing sergeant at 6:00 a.m. Flaviano stated that he had not, in fact, been needed at turnover meetings for "the entire year of 2012" (this meeting occurred in early July). He observed Chief Daly become "openly hostile" and shift her position to concerns about unauthorized absences and that he was setting his own schedule. Chief Daly gave Flaviano until the end of the month to resolve his childcare scheduling so that he could work a regular schedule (*id.* at 40–43; Flaviano Decl. ¶ 10).

---

[1] The actual history of how Flaviano's alternate work schedule developed before June 2012 is muddled, particularly when considering only admissible evidence. The interpretation of the details of Flaviano's work schedule prior to June 2012 as described in this order are presented only for background purposes. The true facts about his work schedule prior to June 2012 are immaterial inasmuch as all agree this action addresses conduct from June 2012 and beyond.

On July 9, 2012, Flaviano submitted a written memorandum with the subject "Hardship Consideration for Childcare" to Chief Daly formally requesting an alternate work schedule, as follows (Flaviano Decl., Exh. 2 at *431):

> This letter is a formal request for accommodation regarding the childcare of my 3 year old daughter.
>
> Currently, I work from 0700 to 1500 hours on Tuesday, Wednesday, and Thursday.  This allows me to take my daughter to childcare.  I work a regular shift on my other work days.  This arrangement has worked successfully for my professional and personal responsibilities.
>
> My wife is unable to take our daughter to daycare as she is currently assigned a 0600–1400 hours shift.  Our daughter is enrolled in KinderCare.  The earliest arrival time there is 0615 a.m.
>
> I am also requesting that this schedule continues for when my daughter starts Kindergarten.
>
> We don't have family in the area so daycare is our only option.
>
> Please continue to allow me to work 0700–1500 hours for these reasons.

Both Chief Daly and Lieutenant Coleman denied the request.  Chief Daly wrote her denial by hand in the "Explanation" section of the request form and signed it on July 9.  It read as follows (*id.* at *432):

> An AWS [alternate work schedule] does not meet the needs of this Dept. operational expected standards.
>
> Request is denied.
>
> However, I would be willing to move you to a 3rd watch position to accommodate your needs.  Please advise if you are interested.

On July 10, Lieutenant Coleman sent a memorandum to Flaviano, explaining his denial, as follows (*id.* at *433):

> Sergeant Flaviano, I'm denying your request for an alternate work schedule as you need to be at work from 0600 to 1400 hours for the operational needs of the department as the 2nd Watch Sergeant. The 2nd Watch Sergeant must be available at morning briefings and have contact with the 1st and 2nd Watch Officers.  There is already coverage for the 3rd Watch Sergeant position and your overlap is not warranted at this time.  As a sergeant you are expected to be available and assessable [*sic*] to the officers on a daily basis.

4

1    However, I will forward your request to the Chief of Police for her
2    review.

3    On July 11, Flaviano responded to Chief Daly by letter, explaining the scheduling

4    problems he initially faced when he and his wife worked consecutive shifts and that he would

5    not be able to continue his training schedule if he shifted to a third watch position (though the

6    record is unclear on why he could not continue that role from the third watch) (*id.* at *434).

7    On July 12, Chief Daly responded that Flaviano's letter failed to address his current

8    challenges or to provide a workable solution.  She stated that "[t]here are typically no alternate

9    work schedules for sergeants, as this department is a 24 hour facility and operational needs

10   outweigh the personal needs of the employees."  She further stated that she would seek other

11   options if Flaviano could no longer be available in a training capacity (*id.* at *435–36).

12   Flaviano complained to Chief Daly that two other sergeants were provided accommodation

13   schedules of 0800 to 1700.  Chief Daly did not respond to that complaint (Flaviano Decl. ¶ 11).

14   On July 13, Flaviano filed a written discrimination complaint with the Equal

15   Employment Opportunity office of DSH, alleging that he had been discriminated against on the

16   basis of his race inasmuch as Chief Daly had denied his request while certain Caucasian

17   sergeants received that accommodation.  Flaviano identified Sergeants Arnhold (first name

18   unknown), Harley Detwiler, and Adam Tharp, as well as officers Taylor (first name unknown)

19   and Aqul (first name unknown) as similarly situated individuals that had received a comparable

20   accommodation to what he requested (Flaviano Decl., Exh. 2 at *437–38).  Flaviano also filed a

21   formal discrimination complaint with the executive director of Napa State Hospital, Dolly

22   Matteuci (*id.* at *440–41).

23   Immediately after he filed his complaints, Flaviano observed Chief Daly declining to

24   speak to him in the hallway and staring him down "on a daily basis."  Several days later, Chief

25   Daly transferred Flaviano to third watch (2:00 p.m. to 10:00 p.m.), which was consecutive to his

26   wife's shift.  Defendant Lieutenant Jason Gooding became Flaviano's supervisor on that shift.

27   As a result of the new schedule, Flaviano and Maisonet began conducting a "baby exchange" on

28   the premises of the hospital, exchanging care of their daughter at the start of Flaviano's shift

(just after the end of Maisonet's shift) (Flaviano Decl. ¶ 15).

**United States District Court**
For the Northern District of California

1       Flaviano submitted a new request for an accommodation, seeking an extra five or ten

2   minutes at the start of a shift to facilitate the baby exchange and seeking permission to perform

3   the exchange on hospital premises.  Chief Daly denied this request, stating no other sergeants or

4   officers were permitted similar accommodations (*id.* ¶ 17).  Flaviano filed another internal

5   workplace complaint, this time alleging he had been the subject of retaliation when he was

6   transferred to third watch (*id.*, Exh. 4).

7       In October 2012, Flaviano's wife, Raquel Maisonet, "had to submit [a Family and

8   Medical Leave Act] form for a serious medical condition" (Maisonet Decl. ¶ 5).  (She does not

9   specify *whose* medical condition required her attention.)  The request was apparently granted

10  (although the record is unclear who approved the request).  Flaviano elected to take concurrent

11  leave (for a period of nine or ten days), so he "submitted an FMLA packet to assist his wife for

12  [*sic*] a serious medical condition," and took paid vacation concurrent with that leave.

13  Lieutenant Gooding approved the request (Flaviano Decl. ¶ 20; Gooding Decl. ¶ 10).  (Again,

14  there is no indication of *whose* medical condition led to Maisonet's request for leave.)

15      Flaviano learned that Maisonet needed to extend her leave by several days, so he called

16  Lieutenant Gooding on the telephone requesting to extend his leave and vacation by three days

17  (*id.* ¶ 21).  The parties dispute whether Lieutenant Gooding approved Flaviano's request over

18  the phone, but all agree that Lieutenant Gooding eventually deemed Flaviano AWOL for the

19  three days for which he requested an extension (*compare* Gooding Decl. ¶ 10 *with* Flaviano

20  Decl. ¶ 21).  Lieutenant Gooding planned to dock Flaviano's pay due to his AWOL status

21  (Gooding Decl. ¶ 10).

22      On October 30, after the three-day period of requested extended leave ended, Flaviano

23  brought his daughter to work with him while on duty.  Flaviano met with Lieutenant Gooding

24  and Chief Daly that day.  Lieutenant Gooding became hostile and yelled, "I'm tired of getting

25  caught in the middle of your childcare issues with the chief" and "you are the only one in this

26  department with a problem."  Lieutenant Gooding also complained about the serial requests for

27  FMLA leave from Flaviano and his wife and aggressively stated he was "tired of [Flaviano]

28  trying to find different angles for childcare" (Flaviano Decl. ¶¶ 23–24).

United States District Court

For the Northern District of California

Lieutenant Gooding prepared a written counseling record to memorialize the events of that day, which, assuming no further incidents, was to remain in Flaviano's personnel file for one year. The counseling record described the events of October 30, noting that Flaviano's conduct "revealed exceedingly poor judgment on [his] part, nullified [his] ability to respond to any type of exigent situation and set an example of unacceptable and unprofessional behavior to those [he] supervise[d]" and also recounted that Flaviano had "been repeatedly advised that [his] unwillingness or inability to resolve [his] childcare issues [were] detrimental to the department and severely impair[ed his] effectiveness as a supervisor" (Gooding Decl., Exh. D).

The same month, the Equal Employment Opportunity office of DSH concluded its investigation into Flaviano's initial complaint, finding that Sergeants Tharp and Detwiler had never requested a childcare accommodation and that Flaviano's request was "more likely than not" due to "business reasons and not due to discrimination based on his race, Filipino" (Gooding Reply Decl., Exh. B).[2]

In early November, Lieutenant Gooding told Flaviano that his FMLA form (from the prior month) could not be accepted because he could not read the physician's signature on the form, which signature "appeared to be no more than a straight line," and that there was no printed version of the physician's name (Gooding Decl. ¶¶ 16–17). Flaviano submitted a follow-up form, on which Gooding "took no action" (Flaviano Decl. ¶ 24). Lieutenant Gooding did not process the follow-up form because it appeared to request a "continuous ten-year future period" of leave (Gooding Decl. ¶ 19). By that time, Flaviano had been placed on leave (for reasons not related to the claims still at issue), so Lieutenant Gooding mailed his request for further information to Flaviano by certified mail, for which he received a return receipt signed by Flaviano (*id.* ¶¶ 22–23, Exhs. E–F).

In November, after Flaviano had received no response from his internal retaliation complaint, he filed a second retaliation complaint with the department's Equal Employment

---

[2] Exhibit A to Lieutenant Gooding's reply declaration is a cover letter from October 2012 stating that the department's Equal Employment Opportunity office had concluded an investigation from Flaviano's "July 13, 2001," complaint. The year 2001 is circled, and 2012 is handwritten next to it. Lieutenant Gooding's declaration does not discuss this discrepancy. Nevertheless, Exhibit B is a report concluding the investigation of the complaint with the Equal Employment Opportunity office dated July 13, 2012.

United States District Court
For the Northern District of California

1  Opportunity office regarding Lieutenant Gooding's plan to dock his pay and the denial of his

2  extra leave days (Flaviano Decl., Exh. 5).

3  In March 2013, an email from Sergeant Jessica Heine to the whole department regarding

4  fund-raising for a special olympics event stated that her hours were 0700–1500 (the same hours

5  requested by Flaviano as an accommodation for his childcare needs).  Counsel for Flaviano

6  forwarded that email to the department's EEO investigator to be considered in the then-ongoing

7  investigation into Flaviano's second complaint (Flaviano Decl., Exh. 6).

8  In November 2013, the department's EEO office concluded the investigation of

9  Flaviano's second complaint.  It "did not reveal sufficient evidence to prove a violation of the

10  Department's Equal Employment Opportunity policies" (*id.*, Exh. 7).

11  In May 2013, Napa State Hospital terminated Flaviano's employment following a series

12  of disciplinary actions unrelated Flaviano's childcare accommodations (though considered in

13  light of his counseling record from October 2012).  Flaviano commenced an action before the

14  California State Personnel Board relating to his termination.  He agreed to dismiss that action

15  and release all claims giving rise to his termination in exchange for the department's agreement

16  to remove the disciplinary records relating to the incident that led to his termination from his

17  personnel file and to accept Flaviano's resignation for retirement purposes (*see* Dkt. No. 29).

18  In May 2014, Flaviano filed a complaint with the California Department of Fair

19  Employment and Housing alleging harassment and retaliation (Flaviano Dep., Exh. 7).

20  Flaviano commenced this action in federal court here in San Francisco in December

21  2014.  Defendants brought an early summary judgment motion contending that Flaviano's

22  complaint, which raised claims of discrimination pertaining to his termination as well as other

23  conduct, was entirely barred by the release in the agreement settling his challenge to his

24  dismissal.  The order on that motion granted in part and denied in part defendants motion,

25  limiting the scope of his release to claims that culminated in his termination and dismissing

26  claims based thereon.  The remaining claims could not be held subject to the release on

27  summary judgment (though the order left open the possibility that defendants would prevail on

28  that issue at trial) (Dkt. No. 29).

United States District Court

For the Northern District of California

1    Flaviano's remaining claims assert (i) race, national origin, and marital status

2    discrimination under the California Fair Employment and Housing Act, (ii) retaliation under

3    FEHA, (iii) harassment under FEHA, (iv) violations of CFRA, (v) violations of FMLA, and

4    (vi) violations of FLSA.

5    Defendants now move for summary judgment on all remaining claims on the merits of

6    the claim (rather than on the release).  This order follows full briefing and oral argument.

7                                                    **ANALYSIS**

8    Summary judgment is appropriate where "the movant shows that there is no genuine

9    dispute as to any material fact and the movant is entitled to judgment as a matter of law."

10   FRCP 56(a).  Only admissible evidence can create a triable issue of fact on summary judgment.

11   FRCP 56(e); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

12   Our defendants raised several evidentiary objections in their reply brief, all discussed

13   below.  Flaviano made no evidentiary objections in his opposition or in supplemental filing

14   following defendants' reply brief pursuant to Civil L.R. 7-3(d)(1).  Nevertheless, for the

15   avoidance of doubt that summary judgment is proper, this order does not consider evidence

16   proffered by defendants that would have been excluded if Flaviano had properly objected.

17   The admissible evidence in our record, drawing all reasonable inferences in Flaviano's

18   favor, does not reveal any genuine dispute of material fact, and defendants are entitled to

19   judgment as a matter of law on all claims.[3]

20       **1.     DISCRIMINATION CLAIMS.**

21   Flaviano contends that he was subject to discrimination on the basis of race and national

22   origin when Chief Daly and Lieutenant Gooding denied his request for an alternate work

23   schedule that spanned parts of second and third watches to accommodate his childcare needs

24   and again when he requested to arrive five minutes late to his shift on third watch to conduct a

25   "baby exchange" with Maisonet.  To state a claim for discrimination under FEHA, Flaviano

26   must show, *inter alia*, some circumstance that suggests a discriminatory motive.  *Guz v. Bechtel*

27

28       [3]  This order does not address defendants' arguments that Flaviano's claims are barred by the
     applicable statutes of limitations or by the requirement to exhaust administrative remedies.

United States District Court

For the Northern District of California

*National, Inc.*, 24 Cal. 4th 317, 355 (2000). Flaviano contends he has shown that defendants

harbored a discriminatory motive via circumstantial evidence shown by the alleged fact that

similarly-situated Caucasian or white officers and sergeants at Napa State Hospital received the

childcare accommodations that he was denied (namely, working a shift of 0700 to 1500, rather

than the scheduled second watch shift of 0600 to 1400, and, later, being allowed to exchange

care of his child with his wife on premises in the first few minutes of his shift). Defendants

respond that Flaviano is incorrect on the facts and that he offers no admissible evidence as

support.

In his declaration in opposition to defendants' motion, Flaviano discussed Sergeants

Harley Detwiler, Arnhold (first name unknown), and Adam Tharp, as well as Officer Taylor

(first name unknown) (Flaviano Decl. ¶ 12):

> These employees are all Caucasian, or white, and they have all
> been provided with schedule accommodations for childcare needs,
> or they have been allowed to conduct "baby exchanges" in the
> building or parking lot. I have personally observed these
> accommodations prior to July 2012.

Defendants object to Flaviano's assertions that these purported comparators received

schedule accommodations "for childcare needs" or that they were "allowed" to conduct baby

exchanges inasmuch as they lack foundation and Flaviano lacks personal knowledge of the

formalities or justifications for any such accommodation. That objection is Sᴜsᴛᴀɪɴᴇᴅ.

Nevertheless, Flaviano's testimony as to his personal observations of alternate work schedules

(but not their reasons) and of baby exchanges (whether or not sanctioned), remains admissible.

Flaviano also offers the declaration of his ex-wife Raquel Maisonet, in which she avers

(Maisonet Decl. ¶ 3):

> I have personally observed other Hospital Police Officers and
> Sergeants engage in Alternative Work Schedules ("AWS"). My
> supervisor, Sgt Detwiler, had an AWS back in 2011 and 2012, to
> assist him with his childcare needs. I personally observed Sgt
> Detwiler bring his daughter to work as part of a childcare
> exchange, and I personally observed him arriving at work at 0700
> as well as 0800 in the morning. Additionally, Sgt Tharp had a
> childcare accommodation work schedule for his two children,
> which I personally observed on many occasions. Additionally,
> Officer Green and his partner, Psychology Technician Dawn, have
> been permitted to conduct childcare exchanges in the Police
> Department parking lot.

Defendants also object to Maisonet's declaration as lacking foundation and personal knowledge. As with Flaviano, Maisonet has not established that she has personal knowledge of the *reason* for Sergeants Detwiler's or Tharp's alternate work schedules or whether the police department *permitted* Officer Green to pass supervision of his child to his partner in the parking lot. To that extent, defendants' objections are SUSTAINED. Nevertheless, Maisonet's personal observations, namely, that Sergeants Detwiler and Tharp had some alternate work assignment (but not their reasons) and that Officer Green in fact exchanged his child in the parking lot (whether or not sanctioned) remain admissible. Counsel for Flaviano failed to submit deposition testimony (or records) that could competently address the reasons for these accommodations.

Flaviano also offers the written schedule for sergeants and officers in effect in July 2012, which he presented to Chief Daly and Lieutenant Gooding when they met to discuss his request for an alternate work schedule. At that meeting, Chief Daly initially informed Flaviano that the department could not continue to allow him to maintain an alternate work schedule because he needed to attend the turnover meetings with the outgoing sergeant from the first watch at 6:00 a.m. Flaviano replied that he had not, in fact, been needed at turnover meetings for "the entire year of 2012" (this meeting occurred in early July). Chief Daly then shifted her position to concerns about Flaviano's unauthorized absences and that he was setting his own schedule (Flaviano Decl. ¶ 10).

Flaviano denied both accusations. He now avers that Chief Daly then "took the position that no Sergeants are allowed childcare accommodations at Napa State Hospital," which, he asserts, "is not true" (*id.* ¶ 11). Flaviano then pointed Chief Daly to a written work schedule. The proffered schedule indicated that Sergeant Arnhold had been assigned a schedule of 0800–1700 and that Sergeant Detwiler had been assigned a temporary schedule from 0800–1600, though he would later return to a regular schedule of 1000–1800 (Flaviano Decl., Exh. 2 at *437). In his declaration, Flaviano states that Sergeants Arnhold and Detwiler had been given these alternate schedules as childcare accommodations (Flaviano Decl. ¶ 11). Contrary to Flaviano, there is no indication that Sergeants Arnhold and Detwiler received

United States District Court

For the Northern District of California

alternate work schedules "as the result of childcare."  Rather, the document simply stated each employee's assigned schedules.

Defendants object to Flaviano's reliance on this exhibit and his description thereof as lacking foundation or personal knowledge and as speculation regarding the reasons that Sergeants Arhnhold and Detwiler received the alternate schedules reflected thereon.  To that extent, defendants' objection is **SUSTAINED** inasmuch as Flaviano has no basis for the conclusion that Sergeants Arnold and Detwiler received an accommodation "for childcare purposes" or that Chief Daly's statement was untrue.

Defendants also object to consideration of the schedule as hearsay.  The schedule appears as one page of Exhibit 2 appended to Flaviano's declaration.  Exhibit 2 is the complaint Flaviano submitted to the department's Equal Employment Opportunity office following the denial of his request for an alternate work schedule.  Defendants are correct that statements in the EEO complaint are, themselves, hearsay, and that the complaint cannot authenticate documents appended thereto.  Defendants' hearsay objection, however, is **OVERRULED**, because Flaviano *independently* authenticated the work schedule that he showed to Chief Daly (Flaviano Decl. ¶ 11).  Defendants do not rebut Flaviano's description of the document, which, as a statement by the department, is not hearsay when offered by Flaviano.  FRE 801(d)(2).

At his deposition, as in his declaration, Flaviano also identified Officer Donald Green and Sergeant Doug Smithson as individuals who brought their babies onto the premises to exchange care with their partners and arrived late after that exchange.  He admitted, however, that he had no knowledge about whether Lieutenant Gooding knew of or approved Officer Green's and Sergeant Smithson's conduct (Flaviano Dep. at 68–72).  He further admitted that he never discussed why Officer Green or Sergeants Smithson or Detwiler worked according to alternate schedules, because it was "not [his] business" (*id.* at 112).  (When asked at his

United States District Court

For the Northern District of California

1   deposition to identify other officers and sergeants who received childcare accommodations at

2   his deposition, Flaviano failed to identify Sergeants Arnhold or Tharp.)[4]

3       Flaviano also offers the an email from Sergeant Jessica Heine sent in March 2013 to the

4   whole department regarding fund raising for a special olympics event in which she stated that

5   her hours were 0700–1500 (the same hours requested by Flaviano as an accommodation)

6   (Flaviano Decl., Exh. 6).  This email does not demonstrate that Sergeant Heine worked that

7   schedule *as a childcare accommodation*.

8       Flaviano repeatedly cites Chief Daly's and Lieutenant Gooding's statements in the EEO

9   investigation of Flaviano's second complaint as admissions contrary to their position that

10  sergeants could be assigned alternate work schedules (Pl.'s Opp. at 2, 9, 18–19).  But those

11  "admissions" are not contrary to defendants' positions or to the earlier statements by Chief Daly

12  or Lieutenant Gooding.  As stated, at the July 2012 meeting with Flaviano, Chief Daly "took the

13  position that no Sergeants are allowed childcare accommodations at Napa State Hospital"

14  (Flaviano Decl. ¶ 11).  Similarly, in a memo sent to Flaviano after the July 2012 meeting,

15  Lieutenant Gooding stated, "[t]here are typically no alternate work schedules for sergeants" (*id.*,

16  Exh. 2 at *435).  Neither statement precluded the possibility that an alternate work schedule

17  might atypically be available for *some* purpose other than childcare.  The statements offered by

18  Flaviano as "admissions" to the contrary in fact confirm that interpretation.

19      Specifically, Chief Daly stated that "alternate work schedules are for the department

20  need only and not for personal need," and identified "bike patrol" and "educational purposes"

21  that are "for the benefit of the department" as the only bases for granting an alternate work

22  schedule (Poore Decl., Exh. 2 at *581).  Similarly, Lieutenant Gooding stated he had approved

23  an alternate work schedule "to attend training for a day" or for an employee "who wants to

24  work on getting their degree" (*id.*, Exh. 3 at *588).  Neither statement indicated that personal

25  needs such as childcare had ever served as a basis for granting an alternate work schedule.

---

27      [4] This order notes that defendants' opening brief confusingly restated Flaviano's theories of
    discrimination as if they were defendants' own positions, stating, *inter alia*, "Sgt. Detwiler ('Detwiler') was also

28  an AWS [alternate work schedule] for his childcare issues" (Defs.' Mtn. at 9).  Notwithstanding that confusing
    phrasing, there is no evidence that Sergeant Detwiler received an alternate work schedule to accommodate
    childcare issues.

**United States District Court**
For the Northern District of California

1  Defendants object to Chief Daly's and Lieutenant Gooding's statements as part of the

2  EEO investigation, which are appended to the declaration of Attorney David Poore, counsel for

3  Flaviano.  As to Chief Daly's and Lieutenant Gooding's statements, Attorney Poore avers that

4  he appended "true and correct cop[ies] of the EEO statment[s] that [the respective defendants]

5  provided, which [were] produced" by defendants in discovery (Poore Decl. ¶¶ 3–4).  Attorney

6  Poore has not shown that he can competently authenticate the statements given by Chief Daly or

7  Lieutenant Gooding, and the bare fact that they were produced in discovery is insufficient.

8  Moreover, the statements are unsigned and appear to be written records of interviews with Chief

9  Daly and Lieutenant Gooding, *not writings by those defendants or adopted by them*.  That is, the

10  statements are not before us, but rather the summaries written by the department's EEO

11  investigator of statements made in connection with the investigation.  The EEO investigator's

12  summaries (even if purportedly verbatim) are hearsay.  (If a newspaper or police report reported

13  that a party opponent had admitted the light was red, it would still be hearsay.)  Defendants'

14  authentication and hearsay objections are, therefore, Sᴜꜱᴛᴀɪɴᴇᴅ.  In any case, even assuming

15  those statements could be elicited in an admissible form, they would not raise any material

16  dispute of fact.  Rather, they support *defendants'* case.

17  In ploughing through this record, the Court has asked itself why plaintiff's counsel

18  failed to depose the managers to connect the dots on these gaps.  At all events, such testimony is

19  missing.

20  Ultimately, although Flaviano has offered evidence to show that certain sergeants and

21  officers received some schedule accommodation for unknown reasons and that others brought

22  their children onto the premises to exchange care with their partners, there is absolutely no

23  admissible evidence that anyone ever received a schedule accommodation *for childcare*

24  *purposes* or that anyone ever received *permission* to conduct a "baby exchange" on premises

25  (and to be late for a shift following said exchange).[5]

26

27  _____

28  [5] This order does not consider Lieutenant Gooding's description of his "investigation" into Napa State Hospital's records inasmuch as he does not describe the investigation at all, much less demonstrate that his review was comprehensive.  This order also does not consider Lieutenant Gooding's recitation of Sergeants Detwiler's and Tharp's assurances that they had never sought nor received schedule accommodations for

United States District Court

For the Northern District of California

1    Furthermore, in his reply declaration, Lieutenant Gooding avers that Flaviano worked as

2    an operations sergeant and had responsibilities involving briefing and supervising his patrol

3    staff at the start of his watch, while Sergeants Detwiler, Arnhold, and Tharp worked in different

4    assignments "and had different hours, duties and responsibilities than Plaintiff, and, unlike an

5    Operations Sergeant like Flaviano, were not required to conduct shift briefings of oncoming

6    shift officers" (Gooding Reply Decl. ¶ 5).  Thus, not only has Flaviano failed to show with

7    admissible evidence that any officer or sergeant in the history of Napa State Hospital *other than*

8    *himself* ever received the accommodation he sought (much less an officer of a different race,

9    national origin, or marital status), he has also failed to show that the sergeants he named who

10   received *some* alternate work schedule were similarly situated to himself.  On the contrary, their

11   assignments differed materially with respect to the importance of their shift schedules.[6]

12   Accordingly, Flaviano has failed to show discrimination on the basis of race or national

13   origin by circumstantial evidence, and defendants are entitled to summary judgment on claims

14   relating to the denial of Flaviano's request for an alternate work schedule and his subsequent

15   request for an accommodation to perform a "baby exchange" on the premises (and during his

16   shift).

17          **B.     Marital Status.**

18          Flaviano alternatively contends that Lieutenant Gooding's and Chief Daly's angry

19   comments about Flaviano's failure to make childcare arrangements that would allow him to

20   come to work on time constitutes direct evidence of discrimination on the basis of marital

21   status.  He contends they "engaged in an attack" on his marriage (Pl.'s Opp. at 8).  But, as

22   stated, Flaviano has offered no evidence that his requested schedule accommodation would

23   ─────────────────────

24   childcare needs, which recitation is inadmissible hearsay (Gooding Decl. ¶ 14; Gooding Reply Decl. ¶ 5).
     Nevertheless, Flaviano has failed to offer any admissible evidence to support a reasonable inference that

25   *anyone*, much less a similarly situated employee, received the accommodations he sought, *except for himself*
     *when he orally requested the accommodation from prior supervisors.*

26          [6] Defendants provide an extensive explanation of the problems posed by Flaviano's proposed

27   accommodation to arrive late for one shift and work through the start of the next shift, namely, that he would
     miss turnover briefings, fail to provide supervision for subordinates at the start of his first shift, and provide

28   unneeded supervision at the start of the next shift (*i.e.*, the end of his altered schedule).  But this description is
     unsworn attorney argument contained in a footnote of defendants' reply brief (Defs.' Reply at 2 n.2).
     Accordingly, this description is not considered.

have been granted for *any* personal need, regardless of marital status.  Moreover, Chief Daly's and Lieutenant Gooding's comments simply show animus against Flaviano due to his failure to arrange his personal life to accommodate the duties of his job.  That does not indicate animus relating to his marital status (or due to his membership in any protected class, for that matter).  Flaviano's claims based thereon fail.[7]

### 2.   RETALIATION CLAIMS.

Flaviano contends that defendants retaliated against him for filing his two EEO complaints and internal complaints.  To state a claim for retaliation under FEHA, Flaviano must show:  (i) he engaged in protected activity, (ii) defendants subjected him to an adverse employment action, and (iii) there was a causal link between the protected activity and the adverse employment action.  *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 506 (9th Cir. 2000).  This order assumes, solely for the sake of argument, that Flaviano's EEO and internal complaints constituted "protected activities," although, as discussed above, his allegations of discrimination, which also formed the basis for those complaints, fail.  We turn instead to the purported adverse employment actions that Flaviano suffered.

"Not every employment decision amounts to an adverse employment action."  *Strother v. Southern Cal. Permanente Med. Group*, 79 F.3d 859, 869 (9th Cir. 1996).  For the purposes of a retaliation claim under FEHA, an adverse employment action is one that "materially affect[s] the terms, conditions, and privileges of employment . . . ."  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1054 (2005); *see also Hardin v. Wal Mart Stores, Inc.*, 604 Fed. Appx. 545, 547 (9th Cir. 2015) (unpublished) (citing *Yanowitz*), *cert. denied*, 136 S. Ct. 331 (2015).

Flaviano contends he suffered the following adverse employment actions:  his assignment to third watch, his supervisors' change in demeanor, the disciplinary record after he

---

[7] Flaviano cites Maisonet's declaration as evidence of a concerted attack on their marriage by our defendants.  He appears to refer to Maisonet's complaint about the frustrated demeanor of her supervisors when she requested FMLA leave (Maisonet Decl. ¶ 5).  Maisonet's anecdote is simply irrelevant and does nothing to show discrimination against Flaviano on the basis of his marital status.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    brought his child in to work, the denial of his vacation request, and the docking of his pay.

2    Each purported adverse employment action is addressed in turn.

3    **A.    Assignment to Third Watch.**

4    Flaviano contends that defendants retaliated against him by reassigning him from second

5    watch (6:00 a.m to 2:00 p.m.) to third watch (2:00 p.m. to 10:00 p.m.) shortly after he filed his

6    first EEO complaint.  Defendants contend this reassignment could not have materially affected

7    the terms and conditions of Flaviano's employment, because by the express terms and

8    conditions of his employment, Flaviano was "required to work any shift and schedule in a

9    variety of settings throughout the hospital and may be required to work overtime and float to

10   other work locations as determined by the operational needs of the hospital" (Gooding Decl.,

11   Exh. A).  A mere transfer does not constitute an adverse employment action.  *Akers v. County of*

12   *San Diego*, 95 Cal. App. 4th 1441, 1455 (2002).

13   Flaviano responds that his reassignment constituted an adverse employment action

14   because it interfered with his family life.  Specifically, he contends that the reassignment

15   required him to perform a "baby exchange" with Maisonet at the close of her shift and the start

16   of his shift.  Flaviano cites *Patten v. Grant Joint High School District* for the proposition that an

17   involuntary transfer could constitute an adverse action if it has an adverse action on the subject

18   employee's family life.  134 Cal. App. 4th 1378, 1390 (2005).  *Patten* does not support that

19   proposition.

20   In *Patten*, a school principal alleged she suffered retaliation after she reported budgetary

21   legal violations to the state legislature.  After the principal's whistleblowing occurred, the

22   school board reassigned her to a different school, which eventually led her to quit (allegedly

23   constituting constructive discharge).  The transfer involved many changed circumstances:  the

24   new assignment was at a smaller school with high-achieving students where the principal (who

25   had just started her career) lacked opportunities for growth or to "make her mark," which the

26   disputed evidence showed could be viewed as a demotion.  Moreover, the board planned to

27   close the new school at the end of the year of the principal's new assignment.  The disputed

28   evidence also showed that prior to the transfer, the school board gave the principal inadequate

United States District Court

For the Northern District of California

1   administrative support.  Critically for Flaviano, the decision *Patten* noted, among other "smaller

2   problems with the . . . transfer," the new school remained in session year-round, which

3   interfered with the principal's family life inasmuch as her children attended a school that

4   followed a traditional schedule.

5   　　　The court in *Patten* noted "many of these actions and problems . . . [did] not rise to

6   material adverse actions on their own" but that the *aggregate* of the actions could, at least

7   enough to survive summary judgment.  *Ibid*.  Contrary to Flaviano, *Patten* did not conclude that

8   a mandatory transfer could constitute an adverse employment action simply because it

9   interfered with the employee's family life.  Thus, his attempt to analogize to *Patten* fails.

10   　　　Moreover, Flaviano presents absolutely no evidence that his reassignment to third watch

11   in fact *required* him to perform a "baby exchange."  Nor would such an inference be reasonable.

12   On the contrary, while Flaviano and Maisonet both worked on second watch, they faced the

13   challenge that the were unable or unwilling to arrange for care of their daughter for the full

14   duration of that shift.  (Thus, Flaviano requested an alternate work schedule.)  Flaviano's

15   reassignment to third watch largely *alleviated* that problem by requiring Flaviano to arrange for

16   care of his daughter only for the last few minutes of Maisonet's shift on second watch (and

17   before his shift) through the first few minutes of his shift on third wach (and after Maisonet's

18   shift).  Any impact on Flaviano's family life stemmed from his refusal to arrange for care of his

19   daughter while he worked *regardless* of the assigned shift, not from his reassignment to third

20   watch.  Flaviano has completely failed to show that his reassignment "materially affected the

21   terms and conditions of [his] employment."  *Yanowitz*, 36 Cal. 4th at 1054.

22   　　　Flaviano also asserts that his reassignment to third watch affected his family life because

23   Maisonet would not be able to work overtime during third watch while he supervised that watch

24   (Flaviano Decl. ¶ 15).  This assertion is inadmissible speculation about how defendants would

25   arrange Maisonet's schedule, and it cannot be reconciled with the fact that up until that

26   reassignment, Flaviano and Maisonet worked on *the very same shift*, though Flaviano did not

27   supervise her (*see* Flaviano Dep. at 27).  Defendants' evidentiary objection on that ground is

28   **SUSTAINED**.  Moreover, even if true, limiting Maisonet's opportunities for overtime would have

been a change to the terms of *Maisonet's* employment (if at all), not Flaviano's.  Maisonet is not our plaintiff.

As to the holding in *Patten*, that a combination of actions could constitute retaliation even if no single alleged action could, Flaviano's remaining allegations did not constitute adverse actions alone or in the aggregate, as now discussed.

**B.      Change in Demeanor.**

Flaviano contends he faced retaliation when Chief Daly's and Lieutenant Gooding's demeanors became cold and harsh towards him after he filed his first EEO complaint (regarding the denial of his request for an alternate work schedule) and when Lieutenant Gooding yelled at him for continuing to seek "different angles" for his childcare needs when both Flaviano and Maisonet sought FMLA leave.  Flaviano offers no evidence whatsoever to suggest that this change in tone "materially affect[ed] the terms, conditions, and privileges of [his] employment." *Yanowitz*, 36 Cal. 4th at 1054.  Indeed, *Yanowitz* expressly stated that "a mere offensive utterance or even a pattern of social slights by either the employer or co-employees cannot be properly viewed as materially affecting the terms, conditions, or privileges of employment . . ." *Ibid.*  Accordingly, Flaviano has failed to raise any dispute of material fact supporting his claim of retaliation under FEHA based on defendants' change of demeanor following his EEO complaints and FMLA requests.[8]

**C.      Counseling Record.**

Flaviano contends he suffered an adverse employment action when defendants issued a disciplinary counseling memorandum after he brought his daughter in to work for the entirety of his shift.  (The counseling memorandum addressed Flaviano's continued failure to make childcare accommodations, which came to a head that day.)  Flaviano concedes that it was not "acceptable or appropriate" to bring his child to work (Flaviano Dep. at 79).

---

[8]  Flaviano cites defendants' statements in connection with the EEO investigation as further evidence of their changed demeanor.  As discussed above, those statements have not been offered in an admissible form. In any case, the statements themselves cannot constitute adverse employment actions (they were provided as part of the investigation), and they simply show defendants' frustration with Flaviano's persistent refusal to resolve the interference with his job duties presented by his childcare issues.

United States District Court
For the Northern District of California

Flaviano cites several decisions identifying "undeserved" negative performance evaluations or disciplinary actions as adverse employment actions, but he offers no evidence or argument suggesting that his counseling record was undeserved.  *See, e.g.*, *Yanowitz*, 36 Cal. 4th at 1055; *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).  Nor could a reasonable jury infer that Flaviano received *unwarranted* discipline for failing to arrange childcare in a manner that enabled him to come to work on time or for keeping his daughter in tow *while on duty as a police officer.*[9]

Flaviano has failed to show his counseling record constituted an adverse employment action for the purposes of his claims herein.

### D.  FMLA/CFRA Request.

Flaviano contends he suffered retaliation when Lieutenant Gooding denied his request for a three-day extension of his leave (which resulted in Flaviano using vacation time to account for his three absences).  (To be clear, neither side contends that the FMLA or CFRA entitled Flaviano to the schedule accommodations he sought.)

All agree that (whether or not Lieutenant Gooding approved the request over the phone) Lieutenant Gooding rejected Flaviano's first written FMLA application because a physician's signature appeared to be no more than a straight line, and the physician's name was not otherwise hand-printed anywhere.  Flaviano adds that Lieutenant Gooding also rejected the application because it was "not specific enough" without explaining the deficiency (Flaviano Decl. ¶ 24).  All further agree that Flaviano submitted a follow-up application, which was never formally approved.  This order assumes, solely for the sake of argument, that Flaviano requested leave for a proper purpose, namely, that his wife was ill with a serious health condition (although the record is unclear on that point).

In his declaration, Flaviano purports to dispute Lieutenant Gooding's description of those events, stating that "[Flaviano] submitted [his] initial FMLA form to Defendant Gooding in October 2012, and, at [Lieutenant Gooding's] request, [Flaviano] submitted a new FMLA

---

[9] To the extent the counseling memorandum played a role in Flaviano's termination, Flaviano released any claim based on his termination, as discussed in the order on defendants' prior motion for summary judgment (Dkt. No. 29).

United States District Court

For the Northern District of California

1  form in November 2012, which [Lieutenant Gooding] took no action on" (Flaviano Decl. ¶ 30).

2  Flaviano makes no mention of Lieutenant Gooding's concern that the second application

3  apparently sought ten years of continuous leave.  Flaviano's narrative *aligns* with Lieutenant

4  Gooding's account of the events.

5  Lieutenant Gooding rejected Flaviano's first application due to issues with the signature

6  and sought clarification of Flaviano's second application because it appeared to request ten

7  years of continuous leave (Gooding Decl. ¶ 18, Exh. E).  Lieutenant Gooding never processed

8  the second application for that reason, and Flaviano never responded to Lieutenant Gooding's

9  request for clarification.  Flaviano does not dispute the authenticity of his signature on the

10  return receipt for that second application (Gooding Decl., Exh. F).

11  Because Flaviano failed to show that he ever perfected his request for leave under the

12  FMLA or CFRA, his claim that his requests were denied in retaliation for his EEO complaints

13  fails.  (Flaviano's claim that Lieutenant Gooding unlawfully interfered with those requests, or

14  that Flaviano suffered retaliation as a result of making those requests also fail.)

15  **E.   Docked Pay.**

16  All agree that Lieutenant Gooding's initial decision to deem Flaviano AWOL for the three

17  days of his requested extended leave was ultimately overruled.  Further, all agree that Flaviano

18  was allowed to use paid vacation time to account for his absence on those three days.  Flaviano

19  contends that he suffered an adverse employment action because his pay was docked

20  notwithstanding the reversal of Lieutenant Gooding's decision.

21  While defendants offer Lieutenant Gooding's declaration that "Flaviano's salary was

22  never actually docked" (Gooding Decl. ¶ 10), Flaviano offers no admissible evidence to the

23  contrary.  Indeed, Flaviano's failure to aver in his own sworn statement that his pay was

24  actually *docked* is stark.  Flaviano states that he "made a complaint about [his] wages being

25  docked" but never actually swears behind that allegation.

26  The only documents concerning Flaviano's alleged docked pay are his EEO complaint

27  and supporting documents (the cited exhibit, Exhibit 5, appears to include Flaviano's internal

28  complaint and union grievance as well, though Flaviano does not explain that discrepancy).

The proffered documents include the allegations of Flaviano's various complaints (which never directly state that his pay was docked), an email from Flaviano's counsel to a representative of the Department of State Hospitals stating that Flaviano had "not received any indication that he had been paid," and a letter from the personnel office at Napa State Hospital indicating that Flaviano had received a "Salary Overpayment" (Flaviano Decl., Exh. 5). The entirety of Exhibit 5 is inadmissible hearsay, which cannot be relied upon to dispute Lieutenant Gooding's unequivocal statement that Flaviano's pay was never actually docked.

Accordingly, Flaviano has offered no evidence of an adverse employment action based on the purported "docking" of his pay. Thus, his retaliation claim under FEHA (and the claim under the FLSA based on the same conduct), must fail.

### 3. HARASSMENT CLAIMS.

For the same reasons Flaviano failed to establish an adverse employment action to support his retaliation claim, he has also failed to establish a "severe or pervasive" pattern of conduct that "altered the conditions of his . . . employment . . . ." *See Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642–43 (9th Cir. 2003). Moreover, for the same reasons he failed to establish his discrimination claims, Flaviano has failed to show that any alleged conduct was "because of" his race, national origin, or marital status, as opposed to due to his failure to arrange for care of his daughter in a manner that enabled him to fulfill his job duties. Cal. Gov't Code 12940(j).

### 4. CFRA AND FMLA CLAIMS.

Flaviano's contention that Lieutenant Gooding unlawfully interfered with his exercise of rights under the FMLA and CFRA (by denying his requests for leave) fails for the same reason that Lieutenant Gooding's conduct did not constitute retaliation. Namely, Lieutenant Gooding's showing that Flaviano never completed the formalities of requesting leave pursuant to those acts remains unrebutted. Nor has Flaviano showed that Lieutenant Gooding's requests for proper documentation were unjustified. (The FMLA requests were never placed in the summary judgment record by counsel.)

1

**CONCLUSION**

2      For the reasons stated above, defendants' motion for summary judgment is **GRANTED**.

3  Judgment will follow.

4

5      **IT IS SO ORDERED.**

6

7  Dated:   January 26, 2017.

8                                        WILLIAM ALSUP
                                         UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

23